**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STATE OF ALABAMA ex rel. STEVE MARSHALL, ATTORNEY GENERAL and the ALABAMA DEPARTMENT OF ENVIRONMENTAL MANAGEMENT, | |
| Plaintiffs, | |
| v. | Case No. 23-cv-00903 (JEB) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, and MICHAEL REGAN, in his official Capacity as Administrator, U.S. Environmental Protection Agency, | |
| Defendants. | |

**DEFENDANTS' MOTION FOR A STAY**

**INTRODUCTION**

Defendants, the United States Environmental Protection Agency and Michael

Regan, in his official capacity as Administrator of the United States Environmental Protection

Agency, (together, "EPA" or the "Agency") respectfully move this Court to temporarily stay this

litigation until September 5, 2023, by which time EPA will have issued a proposed response to

the State of Alabama's application to administer a coal combustion residual permit program for

facilities in the State.[1] As explained in detail below, the proposed stay will promote judicial

economy and conserve party resources. A stay would impose no hardship on the State of

Alabama, would free EPA to focus its limited resources on its proposed action on the State's

request, and would serve judicial economy by avoiding litigation of issues that may well be

rendered moot.

**LEGAL BACKGROUND**

In this citizen suit, Plaintiffs the State of Alabama and the Alabama Department of

Environmental Management (together "Alabama" or the "State") seek an order compelling EPA

to take action on the State's request for approval of its program for control of coal combustion

residuals ("CCR") under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §

6901, *et seq.* RCRA established a framework for regulating hazardous and non-hazardous waste.

*See Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 420, 423 (D.C. Cir. 2018)

("*USWAG*").

---

[1] The parties conferred in good faith regarding this motion pursuant to Local Civil Rule 7(m) on
June 27, 2023 and were unable to narrow the areas of disagreement. Alabama opposes this
motion.

Subtitle C of RCRA establishes a cradle-to-grave regulatory structure for hazardous waste management. 42 U.S.C. §§ 6921-6939g. Subtitle D governs the disposal of solid wastes that are not classified as hazardous. *Id*. §§ 6941-6949a.

Under Subtitle D, EPA must promulgate criteria distinguishing between sanitary landfills, which are permissible under the statute, and open dumps, which are prohibited. *Id*. § 6944(a)–(b); *see also id*. § 6903(14), (26). The criteria must ensure that for any facility classified as a sanitary landfill, "there is no reasonable probability of adverse effects on health or the environment from disposal of solid waste at such facility." *Id*. § 6944(a). Any facility that does not comply with the criteria is considered an open dump and must either upgrade to comply with the criteria or close. *Id*. § 6945(a).

In 2015, EPA promulgated regulations governing the disposal CCR under Subtitle D of RCRA. Hazardous and Solid Waste Management System; Disposal of Coal Combustion Residuals from Electric Utilities, 80 Fed. Reg. 21302 (April 17, 2015) (codified at 40 C.F.R. part 257, subpart D, §§ 257.50–.107) (the "2015 Rule"). Coal combustion residuals or "coal ash" are various forms of waste generated from the combustion of coal. Hazardous and Solid Waste Management System; Identification and Listing of Special Wastes; Disposal of Coal Combustion Residuals from Electric Utilities, 75 Fed. Reg. 35128, 35137 (June 21, 2010). The 2015 Rule established minimum federal criteria for the disposal of coal ash in landfills and surface impoundments. 80 Fed. Reg. at 21303. Failure to comply with those criteria results in a covered coal ash facility being deemed a prohibited open dump. 40 C.F.R. § 257.1.

After EPA issued the 2015 Rule, Congress enacted the Water Infrastructure Improvements for the Nation Act (the "Improvements Act") in 2016, Pub. L. No. 114-322, 130 Stat. 1628 (Dec. 16, 2016). Under Subtitle D as amended by the Improvements Act, a state may

seek EPA's approval of a state permit program for coal ash units that will "operate in lieu of" federal regulation of those units. 42 U.S.C. § 6945(d)(1)(A). States seeking to operate a CCR permit program in lieu of federal regulation must "submit to the Administrator, in such form as the Administrator may establish, evidence of a permit program or other system of prior approval and conditions under State law for regulation by the State of [CCR] units that are located in the State." *Id.* For EPA to approve such a program, the program must require each coal ash unit in the state to achieve compliance with the applicable federal criteria for coal ash units or other state requirements that EPA determines are "at least as protective as" the federal criteria. *Id.* § 6945(d)(1)(B). EPA must act on a complete state submission within 180 days. *Id*. In any state or on tribal lands without an approved program, EPA must implement a federal permit program that requires compliance with the federal criteria. *Id*. § 6945(d)(2)(B).

In August 2017, EPA published non-binding guidance to serve as a technical resource for states in developing and submitting a coal ash program to EPA for approval under the Improvements Act. *See* Crossland Decl., Ex. 1 (Coal Combustion Residuals State Permit Program Guidance Document; Interim Final (Aug. 2017), hereinafter "Interim Final Guidance"). In the Interim Final Guidance, EPA explained the Improvements Act provisions and how the guidance is intended to aid EPA's review of state coal ash program applications. *See id.* at iv. EPA provided notice of the availability of the Interim Final Guidance in the Federal Register. Release of Interim Final Guidance for State Coal Combustion Residuals Permit Programs; Comment Request, 82 Fed. Reg. 38685 (Aug. 15, 2017).

As relevant to this litigation, the Interim Final Guidance further addresses the required submission by states seeking to administer a state CCR permit program. The touchstone of approvability is whether the proposed program is "at least as protective" as the federal

regulations. *See* 42 U.S.C. § 6945(d)(1)(B)(i)–(ii). As the Interim Final Guidance reiterates, "the State submission will have to provide evidence that the State Program is at least as protective" as the federal regulations. Interim Final Guidance at 1-4; *see also id.* at 1-5 (stating that EPA may approve a State permit program that allows for flexibilities not provided for in the federal regulations as long as "evidence is submitted so that EPA can determine [that] the program is at least as protective as the federal program"); 2-3 (advising that "[a]n adequate permit program **must meet the statutory requirements** (that is it must ensure that each CCR unit in the State achieves compliance with either the 40 CFR part 257 regulations or another system that EPA has determined is 'at least as protective as' those regulations") (emphasis in original)); 2-6. To the extent EPA requires additional information in order to determine if the proposed state program is at least as protective as the federal criteria, EPA will not view a state's application as administratively complete, and the 180-day period for EPA action does not begin to run. *See id.* at 1-4 (the 180-day clock begins to run once the state has "submitted sufficient evidence to allow EPA to determine whether the [federal] standard . . . has been met"); 2-6 ("The statute establishes a 180-day review period for final determination of adequacy, which begins when EPA determines a State application to be administratively complete.").

## FACTUAL BACKGROUND

Alabama promulgated CCR rules in June of 2018. *See* Alabama Department of Environmental Management ("ADEM") Admin. Code chap. 335-13-15. These rules, as subsequently updated, form the basis of its CCR permit program, and Alabama has been applying these regulations. On December 29, 2021, Alabama submitted to EPA its application to administer its own CCR permit program in lieu of the federal requirements. *See* Answer ¶ 17, Dkt. No. 11. Over the course of 2022, staff with EPA and Alabama met to discuss Alabama's

interpretation of its CCR regulations and whether that interpretation meets the federal standards. *See* Crossland Decl., Ex. 3 at 2. During the course of reviewing Alabama's submission, EPA identified state permits that Alabama either had already issued or intended to issue to several coal-fired power plants that the Agency believed did not comply with federal law.[2] *See id.* EPA's most significant concern relates to Alabama's interpretation of the closure performance standards for surface impoundments[3] because the State permits allow units to close with CCR— again, a form of coal waste—remaining in the groundwater with no or insufficient engineering measures to prevent the continued flow of groundwater into and out of the closed unit. *See* Crossland Decl., Ex. 3 at 2 (noting that the permits issued to three plants "authorize the facilities to close unlined surface impoundments with waste remaining below the water table," and a fourth proposed permit would allow closure of a facility "where the base of the CCR unit is submerged in groundwater"). The continued flow of groundwater through closed CCR units allows for the release of pollutants from CCR contained in the units, posing an ongoing hazard to human health and the environment. *See, e.g.*, 2015 Rule, 80 Fed. Reg. at 21304 (federal liner design criteria for CCR surface impoundments "help prevent contaminants in CCR from leaching from the CCR unit and contaminating groundwater"); *USWAG*, 901 F.3d at 422 ("Groundwater contamination is more likely to occur at sites that are unlined or lack adequate lining between the coal ash and the soil beneath it." (citation omitted)). Based on the Agency's review, "EPA expressed concern that Alabama's permit program appeared to differ from the

_____

[2] Because Alabama' CCR permit program has not been approved by EPA, it does not operate in lieu of federal requirements, which still apply to these units.

[3] A "CCR surface impoundment" is "a natural topographic depression, man-made excavation, or diked area, which is designed to hold an accumulation of CCR and liquids, and the unit treats, stores, or disposes of CCR." 40 C.F.R. § 257.2. In other words, a below-ground storage facility for CCR.

federal program, and that those differences appeared to make the State program less protective than the federal program." Crossland Decl., Ex. 3 at 2.

On November 8, 2022, Alabama wrote to EPA and requested approval of its CCR permit program. *See* Crossland Decl., Ex. 2. The State contended that since it had submitted its application in December of 2021, the deadline for EPA to approve the state's permit program had passed. *See id.* The State further asserted that Alabama's implementation of its regulations should have no impact on EPA's review of the State's application, which, it contended, was limited to the "four corners" of the application. *Id.* Subsequently, Alabama sent EPA a notice of intent to sue on December 9, 2022. *See* Answer ¶ 4.

EPA replied to Alabama on February 1, 2023. In its letter, EPA reiterated its concern— expressed in meetings and correspondence throughout 2022—that Alabama interpreted its regulations to be less protective than federal law. *See* Crossland Decl., Ex. 3 at 2. EPA pointed specifically to Alabama's decision to issue permits for the closure of four coal-fired power plants that authorized the facilities to close unlined surface impoundments with CCR remaining in groundwater. *See* Crossland Decl., Ex. 3 at 2. Such closure is prohibited by federal law. *See* 40 C.F.R. § 257.102(d). The closure requirements are necessary to prevent pollutants from escaping the closed unit and contaminating adjacent ground and surface water. *See USWAG*, 901 F.3d at 422 ("Groundwater contamination is more likely to occur at sites that are unlined or lack adequate lining between the coal ash and the soil beneath it." (citation omitted)) Indeed, in its correspondence with EPA, Alabama offered a "notably different interpretation" of Alabama's CCR regulations as compared to the federal standards. Crossland Decl., Ex. 3 at 2. Given this evidence, EPA asked Alabama to supplement its application to demonstrate that Alabama's CCR permit program provides as much protection as the federal criteria. *Id.* at 3. However, because

Alabama requested a decision on its CCR permit program, EPA stated that, if Alabama did not provide the requested information by February 14, 2023, the Agency would rely on Alabama's application, as well as the subsequent correspondence between EPA and Alabama. *Id.* Alabama subsequently informed EPA on February 17, 2023 that it would not supplement its application. *See* Crossland Decl., Ex. 4.

## LEGAL STANDARD

A federal district court "has broad discretion to stay proceedings as an incident to its power to control its own docket." *Clinton v. Jones*, 520 U.S. 681, 706 (1997). In exercising its judgment, the court must "weigh competing interests and maintain an even balance between the court's interests in judicial economy and any possible hardship to the parties." *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 732–33 (D.C. Cir. 2012) (internal quotation marks and citation omitted). Thus, to determine whether to issue a stay, the court considers (1) harm to the nonmoving party if a stay does issue; (2) the harm to the moving party if a stay does not issue; and (3) judicial economy. *Nat'l PFAS Contamination Coalition v. EPA*, No. 22-cv-132 (JDB), 2023 WL 22078, at *3 (D.D.C. Jan. 3, 2023) ("*PFAS*"). The movant bears the burden of establishing its need. *Clinton*, 520 U.S. at 708.

## ARGUMENT

The Court should stay this litigation pending EPA's issuance of a proposed response to Alabama's CCR application. Staying this case will not impose hardship on the State, will free EPA to focus its limited resources on that response, and will serve judicial economy by avoiding litigation of issues that may well be rendered moot.

I.      **Plaintiffs Will Suffer No Hardship from a Stay.**

In determining whether to enter a stay, courts consider whether there is "a fair possibility" that nonmovants will suffer harm if the motion is granted. *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936). Here, a brief stay poses no risk of harm to Alabama for two reasons.

***First***, the time for EPA to approve or disapprove Alabama's program will not run until August 16, 2023. The relevant RCRA provision states that "[e]ach State may submit to the Administrator, *in such form as the Administrator may establish*, evidence of a permit program . . . for regulation by the State of coal combustion residuals units . . . that, after approval by the Administrator, will operate in lieu of [federal] regulation of coal combustion residuals units." 42 U.S.C. § 6945(d)(1)(A) (emphasis added). EPA subsequently issued guidance for state CCR permit program applications. *See, e.g.*, Interim Final Guidance at iv (stating that the second chapter of the Interim Final Guidance identifies "the documentation EPA generally expects to request from States seeking approval of a [CCR permit] program"). In that document, EPA explained what information the Agency would consider sufficient to evaluate whether a state's proposed permit program is at least as protective as the federal criteria. For example, the "CCR Permit Program Application Checklist" contained in the Interim Final Guidance includes "[a] [n]arrative [d]escription of the permit program." *Id.* at 4-2. Chapter two lays out the contents of this narrative description, including an explanation of how, "using [40 C.F.R.] part 239 as a model . . . the State will ensure that existing and new facilities are permitted or otherwise approved in compliance with . . . [s]uch . . . other State criteria that the Administrator . . . determines to be as protective" as the federal standards. *Id.* at 2-2. Finally, 40 C.F.R. part 239 mandates that, among other things, "state law must *require* that . . . [c]losure and post-closure

care standards for municipal solid waste landfill units . . . achieve compliance with 40 C.F.R. part 258, subpart F." 40 C.F.R. § 239.6(e) (emphasis added).

Alabama has not provided this evidence to EPA, and so the time for EPA to approve or disapprove its program did not begin to run in December of 2021, as Alabama claims. *See* Compl. ¶ 1, Dkt. No. 1. Based on Alabama's decision to issue permits to four coal-fired power plants and its response to EPA's concerns with respect to those permits, EPA requested that the State provide further legal and factual bases supporting Alabama's contention that its proposed CCR permit program complied with federal criteria. *See* Crossland Decl., Ex. 3 at 1–3. As a result, Alabama's application was not administratively complete upon submission in December 2021. Rather, it was complete on February 17, 2023, when Alabama informed EPA that the State would not supplement its application to provide the legal and factual bases for its belief that its CCR program is at least as protective as the federal standards. Therefore, the time for EPA to approve or disapprove Alabama's CCR permit program will not run until August 16, 2023. *See* Interim Final Guidance at 1-4, 2-6.

Because the time for EPA to act has not yet run, Plaintiffs' notice of intent to sue was premature and this case must be dismissed. *See Friends of Animals v. Ashe*, 51 F. Supp. 3d 77, 84 (D.D.C. 2014) (pre-violation notice requires dismissal of suit under analogous requirement in Endangered Species Act), *aff'd* 808 F.3d 900 (D.C. Cir. 2015). Indeed, as 180 days from Alabama's response to EPA's request for additional information has not yet run, Alabama could not notify EPA of the State's intent to sue until, at the earliest, August 17, 2023, and could not file a RCRA citizen suit until October. Therefore, a brief stay will not delay Alabama from obtaining any relief it might be entitled to in the future.

**Second**, even if the Court were to find that Alabama had timely provided notice of its intent to sue, staying this case for only 60 days will not delay the relief sought by Alabama. EPA will, before the expiration of the stay, issue a notice of proposed decision with respect to Alabama's application. *See* Crossland Decl. ¶ 5. Providing notice of EPA's proposed action is a legally required step in approving or disapproving Alabama's proposed CCR permit program— exactly the relief Alabama seeks in this case. *See* 42 U.S.C. § 6945(d)(1)(B) (requiring "public notice and an opportunity for public comment" before EPA may approve or disapprove a state's application); Compl. at 7; *see also Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (in nondiscretionary duty cases, court may only direct an agency to act—not how it shall act). Indeed, this Court has held that, when an agency estimated issuing a notice of proposed rulemaking within six months, it made "little sense for the Court to require the filing of . . . merits briefs from both sides, and then expend resources resolving legal issues that will likely be moot around the same time as it reaches a decision." *Chinatown Serv. Ctr. v. U.S. Dep't of Health and Human Servs.*, No. 21-331 (JEB), 2021 WL 8316490, at *2 (D.D.C. Oct. 13, 2021) (Boasberg, J.). This reasoning applies with even greater force in this case, as EPA will issue its notice in fewer than *two* months.

Moreover, after allowing for comment on its proposed action, EPA expects to issue a final decision by the end of the year—before briefing would likely be complete on the parties' summary judgment motions. *See* Crossland Decl. ¶ 5. Though the Court did not enter this schedule as an order, the parties have already agreed to a schedule under which summary judgment briefing would be complete in 2024, *see* Parties' Joint Proposed Briefing Schedule, Dkt. No. 12, after EPA expects it will issue a final approval or disapproval of Alabama's CCR permit program application. Thus, even under the schedule that Alabama has already agreed to,

this case will likely be moot before the parties complete merits briefing, subject to the number and complexity of the comments received on the notice of the proposed action. *See* Crossland Decl. ¶ 5. Because EPA anticipates providing complete relief to Alabama on a relatively short timeline, this factor weighs in favor of a stay. *See PFAS*, 2023 WL 22078, at *4; *see also Vallejo Ent. LLC v. Small Bus. Admin.*, No. 22-cv-01548 (RCL), 2023 WL 3275634, at *1 (D.D.C. May 5, 2023) ("a party may be required to submit to delay not immoderate in extent and not oppressive in its consequences if convenience will thereby be promoted") (cleaned up).

## II.    A Stay Will Prevent Hardship to EPA.

EPA is likely to suffer hardship from proceeding with this litigation, as EPA staff who are working on responding to Alabama's CCR permit application are also assisting the Department of Justice in this litigation. *See* Crossland Decl. ¶ 6. As the Supreme Court has explained, "[i]f a Government official is to devote time to his or her duties, and to the formulation of sound and responsible policies, it is counterproductive to require the substantial diversion that is attendant to participating in litigation and making informed decisions as to how it should proceed." *Ashcroft v. Iqbal*, 556 U.S. 662, 685 (2009). While it is true that "being required to defend a suit, *without more*, does not constitute a 'clear case of hardship or inequity' within the meaning of *Landis*," *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1112 (9th Cir. 2005) (emphasis added), it is a relevant factor in determining whether to issue a stay, *see PFAS*, 2023 WL 22078, at *5. Here, as in *PFAS*, the diversion of the EPA staff assigned to develop the proposed response to Alabama to address the litigation renders this factor neutral in the analysis. *See id.*; *see also Vallejo Enter. LLC*, 2023 WL 3275634, at *2 (a moving party need not demonstrate hardship or inequity if there is not fair possibility of harm to the nonmoving party).

11

**III.     Judicial Economy Counsels in Favor of a Stay.**

Entering a brief stay in this litigation would also promote efficient use of the Court's resources. The Court has an interest in "avoiding unnecessary litigation that would burden its docket and hamper judicial economy." *Doe v. Sipper*, 869 F. Supp. 2d 113, 117 (D.D.C. 2012) (Boasberg, J.) (internal quotation marks and citation omitted). As discussed above, EPA intends to issue its proposed decision on Alabama's application before the expiration of the stay and take comment on its proposal. Issuing a stay until September will allow the parties to meet and confer regarding whether a longer stay is appropriate once Alabama has had time to review (and potentially comment on) EPA's proposal. It is widely recognized that it is more expeditious and efficient for an agency to proceed through its administrative process to address issues concerning its promulgated rules than it is to resort to the judicial process. *See B.J. Alan Co. v. ICC*, 897 F.2d 561, 562 n.1 (D.C. Cir. 1990) (stating in the context of agency reconsideration that "administrative reconsideration is a more expeditious and efficient means of achieving an adjustment of agency policy than is resort to the federal courts" (cleaned up)).

Because continuing to litigate the same issues that EPA intends to resolve expeditiously through its process is a waste of judicial resources, this factor heavily weighs in favor of granting a stay.

## CONCLUSION

A temporary stay of litigation until EPA completes its rulemaking is warranted because the factors a court considers in deciding a stay motion weigh in favor of granting the stay. Therefore, EPA respectfully requests this Court to issue a temporary stay until September 5, 2023.

12

Date: July 7, 2023

*/s/ Jeffrey Hughes*
JEFFREY HUGHES (N.Y. Bar No. 5367214)
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 305-4598
Email: jeffrey.hughes@usdoj.gov

*Attorney for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that that a copy of the foregoing was served on all counsel of record by the Court's ECF system on July 7, 2023.

*/s/ Jeffrey Hughes*